IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 07-411 |
| | ) | |
| WILLIAM McFALL | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

CONTI, District Judge.

Defendant William McFall ("McFall" or "defendant") filed a motion to determine competency (ECF No. 54) on February 9, 2010. In this memorandum opinion the court considers whether defendant is incompetent to stand trial based upon his assertion that he is linguistically incompetent.

### I. Background

On November 27, 2007, a grand jury returned an indictment against defendant on one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B). The indictment alleged that defendant illegally possessed child pornography on or about May 7, 2007. Defendant maintains that he is a profoundly deaf man with borderline intelligence and a second grade reading level. Based upon those assertions, defendant requested a hearing to determine his competency to stand trial.

A competency hearing was held on September 14, 2010, pursuant to 18 U.S.C. § 4241(a) ("§ 4241"). The court heard testimony from witnesses Susan Hodges ("Ms. Hodges") and Lynn Mosallem ("Ms. Mosallem"), who were called by the government, and from Jennifer Craig ("Ms. Craig") and Dr. Jean Andrews ("Dr. Andrews"), who were called by defendant. During

the competency hearing, the court admitted all exhibits attached to the parties' materials at ECF Nos. 54, 57, 58, 62, 63, 64, and 65. The court will consider the evidence presented during the competency hearing, as well as the submissions of the parties. On this 4th day of February, 2011, the court makes the following findings of fact and conclusions of law with respect to defendant's competency to stand trial.

## II. Findings of fact

### A. McFall's background

1. McFall was born with a twenty percent hearing loss in both ears, but suffered a more profound loss around the age of four or five when he was beaten and sustained a head injury. (Gov'ts Resp. (ECF No. 58), Ex. 1 at 1.) Following the head injury, defendant lost eighty percent of his hearing in the right ear and one hundred percent in the left ear. (Id.) Defendant received a hearing aid for his right ear at approximately the age of six or seven. (Gov'ts Resp., Ex. 3 at 1.) Defendant wears a 2008 Phonak Super Front PP-C-4 BTE hearing aid in his right ear. (Gov'ts Resp., Ex. 1 at 1.) Defendant suffers from tinnitus, or ringing in the ears, has constant drainage in his right ear for which he receives ear drops and antibiotics, and has a history of dizziness for which he does not take any medication. (Hr'g Tr. September 14, 2010 ("Tr.") (ECF No. 70) at 13.) Defendant communicates through his hearing aid and accompanying visual clues, such as lip reading. (Gov'ts Resp., Ex. 1 at 1.) He is not able to communicate through American

Sign Language. (Id.) He communicates on the telephone using a t-coil connected to his hearing aid. (Id.)[1]

2.     Defendant attended public school, enrolled in special education services including speech class at the Shenango School, and graduated from New Castle Senior High School. (Def.'s Supp. (ECF No. 62), Ex. 1 at 3; Gov'ts Resp., Ex. 3 at 1.)

3.     After graduating with from high school, defendant secured a job at a car wash. (Def.'s Supp., Ex. 1 at 4.) Defendant changed jobs and began working as a janitor at the courthouse in Lawrence County, Pennsylvania, a position he has held for thirty-three years. (Def.'s Mot. to Determine Competency (ECF No. 54), Ex. 3 at 4.) Defendant pays his taxes, id., takes care of his own finances via check or credit card, shops for groceries, and takes care of his own car. (Tr. at 109.) Defendant fathered and financially supported a son until the son was eighteen. (Def.'s Mot. to Determine Competency, Ex. 3 at 3-4.) His son is now approximately twenty-six or twenty-seven years old. (Tr. at 109.) Defendant currently lives with his aunt, who has cared for him since the age of five, and helps her around the house. (Def.'s Mot. to Determine Competency, Ex. 3 at 2, 4.) Defendant owns and cares for two Chihuahuas named Suzie and Sassy. (Def.'s Supp., Ex. 1 at 4.) Defendant does not belong to any social clubs for the deaf, play in any sports leagues for deaf individuals, and generally leads an isolated social life with few outlets for social interaction. (Id. at 5.)

**B. Dr. Andrews' June 11, 2010 session**

_____

[1] Defendant also owns a cellular telephone and has the ability to take and store pictures on that phone. (See Def.'s Supp. (ECF No. 62), Ex. 9 at 07:45.)

4.      On June 11, 2010, Dr. Andrews, an expert in linguistic deaf education and linguistic

competence with a Ph. D. in speech and hearing sciences, conducted an evaluation of

McFall.  (Def.'s Supp., Ex. 2 at 1.)  At the beginning of the session, Dr. Andrews told

defendant that she was on his team, she was there to help his case, and she could only

help defendant and not hurt him.  (Tr. at 204.)  The evaluation was taped.  During the

evaluation, McFall was able to carry on conversations with Dr. Andrews.  He paused a

few times to ask her to repeat certain words.  (See generally Def.'s Supp., Ex. 9.)

Defendant engaged in an extended conversation about his favorite T.V. shows and

movies, his difficulty reading captions, and the use of surround sound and amplifier

systems to increase his viewing experience, including where he could purchase those

systems (e.g., RadioShack or Best Buy).  (Id. at 02:10.)  Defendant discussed other

pastimes, including going to the park, id. at 04:50, and shopping online through EBay,

commenting that he buys "a lot of stuff" on EBay.  (Id. at 06:06.)  Defendant engaged in

a conversation about the BP oil spill and its impact on the environment, id. at 11:30, and

later explained he drove, independently, roughly one hour from his home in New Castle,

Pennsylvania, to the session with Dr. Andrews in Pittsburgh, Pennsylvania.  (Id. at

18:20.)

5.      Dr. Andrews recited several sentences containing legal verbiage and directed defendant

to repeat those sentences back to her.  (Id. at 40:53.)  After each sentence, Dr. Andrews

asked defendant the meaning of particular legal words used in the sentences.  (Id.)

Defendant did not know the meaning of the following words: indictment; charged; count;

penalties; imprisonment; procedure; prior conviction; release; pretrial service; and

arraignment.  (Id. at 40:53-47:40.)  Defendant did not understand the phrase "right to

remain silent," id. at 1:07:20, and expressed confusion regarding whether he was required

to answer questions posed by police officers, indicating, "they will probably take me in

jail," if he refused to answer their questions.  (Id. at 1:20:20.)

6.     At the end of the session, Dr. Andrews asked defendant if he wanted to say anything

concerning what might help his case.  Defendant made the following statements:

> I wish they would give me a second chance . . . I made a
> mistake one time . . . I learned my lesson . . . why did they
> put it there . . . put us into this . . . it's wrong . . . they
> should go after the people who put it there . . . they should
> have warned us . . . it's wrong . . . they should've just
> warned us.

(Id. at 1:23:25.)

## C.  Audiologists' testimony

7.     During the competency hearing, the court recognized Ms. Hodges as an expert in the field

of audiology.  (Tr. at 8.)  Ms. Craig, a licensed audiologist, is employed by the Western

Pennsylvania School for the Deaf and was not formally offered as an expert by defendant

during the competency hearing. The court, however, will recognize her as an expert in the

field of audiology.

8.     Each audiologist performed various tests to assess defendant's hearing abilities.  (See

Def.'s Mot. to Determine Competency, Ex. 1; Gov'ts Resp., Ex. 1.)  The audiology test

results and conclusions reached by each audiologist were consistent.  (Tr. at 47.)  Ms.

Hodges testified that with McFall's hearing aid on, in a quiet room, facing away from the

speaker, and with no background noise, McFall responded with 88% comprehension

when presented with a list of speech discrimination words (i.e., a twenty-five-word list of

one-syllable words) at a conversational decibel level.  (Tr. at 19-20.)  When facing the

speaker, defendant scored 100% with the same list of words, despite the addition of background noise.  (Id. at 20.)  Defendant performed at a higher rate of accuracy on the speech discrimination test when he was provided visual cues, such as lip-reading, regardless whether background noise was present.  (Id.)

9.    Ms. Craig stated that with his hearing aid on in quiet conditions, defendant scored 76% in speech recognition, and 44% with added background noise.  (Id. at 62.)[2]  When conducting that test, defendant was not looking directly at Ms. Craig.  (Id. at 77.)[3]  Ms. Craig did not test defendant's ability to lip read (i.e., understand speech via visual cues).  (Id. at 64.)  Ms. Craig testified that only 30% of general sounds used in speech can be lip read, id. at 83, but Ms. Hodges explained she has personally experienced individuals who can lip read 100% of the words on a speaker's lips.  (Id. at 38-39.)  Ms. Craig admitted that defendant uses lip reading as an assist to him in attempting to hear what is being said, but he never relies on lip reading 100%.  (Id. at 83.)

10.    During testing, the audiologists were able to converse with defendant and obtain background information from him.  (Id. at 48, 55-56.)  Defendant was able to follow questions that were asked of him by Ms. Hodges and he responded appropriately to each question.  (Id. at 48.)  Ms. Hodges testified that with his hearing aid on and facing the speaker in a quiet environment, defendant communicated "very well" and "conversation

---

[2] Ms. Hodges and Ms. Craig dispute whether defendant is deaf based upon his audiologic results.  Ms. Hodges testified that defendant scored higher than individuals who are considered deaf (i.e., those with minimal scores). (Tr. at 35.)  Ms. Craig testified that because defendant has no hearing in his left ear, and a profound hearing loss in the right ear, he would be considered deaf.  (Id. at 57.)
[3] Ms. Craig's testimony concerning this subject is contradictory.  Earlier in the hearing, she stated: "Under quiet [sic] situation, one speaker, he was still missing about twenty-fie [sic] percent of what was being said to him facing the speaker."  (Id. at 76.)  During the same line of questioning, Ms. Craig clarified by stating: "when you are doing the test, he's sitting diagonally to the booth.  He is not looking directly at me for that test."  (Id. at 77.)  Ms. Craig opined that, even with visual cues, defendant would do no better than about 76% speech recognition.  (Id. at 78.)

went quite smoothly." (Id. at 21.) This testimony is consistent with the court's visual

review of Dr. Andrews' session with defendant. (See Def.'s Supp., Ex. 9.)[4]

11.    While Ms. Hodges did not test defendant's capacity to follow running speech in her

audiologic evaluation, tr. at 41, defendant was able to follow running speech directed at

him during his session with Dr. Andrews. (See Def.'s Supp., Ex. 9.) During Ms. Hodges

evaluation, she did not assess defendant's ability to hear and understand legal

terminology. (Tr. at 49.)

12.    Defendant has a t-coil setting on his hearing aid to assist him when he uses the telephone,

or to hear through an infrared system in the courtroom. (Id. at 15-16.) A t-coil is a

>   tiny coil wire in the hearing aid that acts like an antenna.
>   The typical use for a t-coil is the telephone. . . . [The] t-coil
>   connects with a magnet in the telephone to allow the
>   hearing impaired person to hear directly from the telephone
>   without any interference. Likewise, in [the] courtroom,
>   there's an infrared system. And by wearing the neck loop
>   and using the receiver, [defendant] can place his hearing
>   aid on the t-coil switch and it will directly bring the sound
>   of the courtroom to his hearing aid without any interference
>   in the room.

(Id. (alteration added).) Prior to the competency hearing, Ms. Hodges visited the

courtroom and tested the neck loop with different hearing aids to make sure the signal

was working properly and that there was not any static. (Id. at 32.) During the exercise,

Ms. Hodges did hear static through the hearing aid, but testified the static was "very, very

minimal," and on a t-coil, "you always get a little bit of static." (Id.) Ms. Hodges stated

that defendant should be used to hearing minimal static, id., and the minimal static

---

[4] This testimony is controverted, however, by Ms. Craig's statement in her report that defendant's "hearing loss is
communicatively handicapping. He can not understand spoken english without visual clues with any consistency."
(Def.'s Mot. to Determine Competency, Ex. 1 at 2.) She also testified that defendant had difficulty answering her
basic questions concerning his background information. (Tr. at 55-56.) The court does not find this testimony
credible in light of the extensive video-taped conversations between defendant and Dr. Andrews.

transmitted through the t-coil would "not be anywhere near" the decibel level of background noise presented to defendant during the audiologic evaluation. (Id. at 33.) Both audiologists testified that the courtroom is a quiet environment. (Id. at 23-24, 81.) Ms. Craig, however, did not evaluate the courtroom's infrared system with respect to its abilities to assist defendant's hearing during court proceedings. (Id. at 83.)

13. The infrared system transmits what is said into the courtroom microphones directly into defendant's hearing aid. (Id. at 22.) For defendant to hear properly someone who is not speaking into a courtroom microphone, he would have to switch his hearing aid off the t-coil setting. (Id. at 23.)

14. Ms. Hodges made several recommendations with respect to courtroom accommodations to assist defendant in hearing and understanding the proceedings. Ms. Hodges recommended the court adopt the following accommodations during court proceedings: (1) use the infrared system, neck loop and t-coil so defendant can hear at an optimum level; (2) allow defendant to observe the speakers mouth in close proximity to where he is seated (i.e., permit visual cues); (3) require all speakers to speak clearly, slowly, and in a normal tone of voice; (4) allow defendant to cue the speaker, counsel, or the court when he does not understand or hear what is said; (5) provide ideal lighting to view the speaker; and (6) reduce all background noise. (Id. at 22-23; see Gov'ts Resp., Ex. 1 at 3.) Ms. Hodges testified the recommended accommodations would help defendant hear in the courtroom and optimize communication. (Id. at 24; Gov'ts Resp., Ex. 1 at 3.)

15. Ms. Craig concluded, based upon her testing results, that defendant's hearing loss is "communicatively handicapping," and that he cannot "understand spoken English

without visual cues . . . [c]onsistently." (Tr. at 64.)  With respect to defendant's ability to hear court proceedings, Ms. Craig stated:

> [I]f you're adding a little bit of background noise, distance, people turning around, him not being able to see someone's face, maybe he's getting half of what's being said.  And that's just hearing it.  As far as what he is understanding of what he is hearing, I don't know that.

(Id. at 66.)

### D.  Speech and language experts' testimony

16.  During the competency hearing, the court recognized Ms. Mosallem as an expert in the field of speech language pathology.  (Id. at 104.)[5]  The court also recognized Dr. Andrews as an expert in linguistic deaf education and linguistic competence.  (Id. at 160-61.)

17.  Ms. Mosallem and Dr. Andrews performed various tests on defendant to determine his linguistic competency.[6]  (See Def.'s Supp., Ex. 1; Gov't Resp., Ex. 3.)  Ms. Mosallem's testing produced, *inter alia*, the following results: (1) defendant rarely needs prompting or assistance with regard to functional communication; (2) defendant responded at a seven-year-old, two-month vocabulary level[7]; (3) defendant scored in the twenty-third percentile on a test of non-verbal intelligence; (4) defendant's functional reading comprehension test results placed him at a third-grade reading level; (5) defendant

---

[5] Defendant objected to the government offering Ms. Mosallem as an expert for the purpose of determining his linguistic competency to stand trial.  (Id. at 102.)  As set forth during the competency hearing, the court will give appropriate weight to Ms. Mosallem's testimony regarding whether defendant's language comprehension is sufficient to satisfy the legal standard for competency.

[6] Ms. Mosallem opined that, during her conversations with defendant, his speech was 100% intelligible to an unfamiliar listener, although he spoke in relatively short sentences.  (Id. at 110.)

[7] A seven-year-old, two-month level falls into the "severe to profound" range.  (Id. at 138.)

exhibited difficulty with figurative language[8]; and (6) defendant scored 25% accuracy and 75% accuracy respectively on multiple choice and true/false courtroom vocabulary tests.[9] (Tr. at 112, 114-17.) Ms. Mosallem also observed defendant had the ability to follow and comment on running speech between two individuals when that speech was not directed at him, id. at 123-23, although that observation was not formally tested. (Id. at 124.)

18. Based upon McFall's test results and her general interaction with defendant, Ms. Mosallem reached the following conclusions: (1) defendant is communicatively competent; (2) he is able to communicate and participate in a courtroom environment if reasonable accommodations are made, including (a) frequent breaks in the proceedings; and (b) counsel educating defendant in real-time about the proceedings using simple and concrete language; (3) defendant is capable of having a factual understanding of the charges if they are explained in a simplistic and concrete manner[10]; (4) defendant should be able to communicate with his attorney; and (5) defendant is in the high-functioning range of the scale for individuals diagnosed with dual disabilities similar to defendant. (Id. 118-19.) Ms. Mosallem testified "the accommodations will provide [defendant] with . . . the level of communicative competency that he requires to participate in courtroom proceedings and have a factual understanding of what is going on and communicate with . . . his defense attorney." (Id. at 150.)

19. Ms. Mosallem made the following additional recommendations: (1) verbal information should be presented to defendant's right side or ear; (2) ambient noise should be reduced

---

[8] Ms. Mosallem testified that many people struggle with or do not understand figurative language. (Id. at 141.)
[9] The government added a caveat that each courtroom vocabulary test consisted of only four questions. (Id. at 118.)
[10] Ms. Mosallem later expanded upon this conclusion, stating defendant requires "increased processing time, especially, if he [is] unfamiliar with the information or appear[s] to be unfamiliar with information." (Id. at 148.)

or eliminated as much as possible; (3) the speaker's mouth must be in defendant's visual field; (4) basic vocabulary should be used in short sentences; (5) defendant's nonverbal cues indicating a failure to hear or understand should be monitored; and (6) defendant should use his eye glasses as prescribed. (Gov't Resp., Ex. 3 at 5.)

20.     Dr. Andrews concluded from her testing of defendant that he is linguistically incompetent. (Def.'s Supp., Ex. 1 at 1.) During the competency hearing, Dr. Andrews opined that there are different standards for linguistic competency depending on the particular setting (e.g., someone can be linguistically competent in daily life, but linguistically incompetent to stand trial, because the language used in those environments is different). (Tr. at 158-59, 161-61, 195-96.)

21.     Dr. Andrews observed that defendant, as a third party, was not able to follow running speech during a lunch conversation between Dr. Andrews and defense counsel. (Id. at 165.) Dr. Andrews testified, however, that the lunch setting was noisier than a courtroom, and defendant was able to follow conversation when he was looking directly at the speaker. (Id. at 165, 202.)

22.     Dr. Andrews stated she found it "very difficult to communicate" with . . . [defendant] through oral language," and referred to the video-taped session as empirical evidence of the communicative difficulties she experienced. The video, however, controverts Dr. Andrews' statement as it relates to her communications and conversations with defendant regarding his background and subjects other than legal vocabulary. See supra p. 4.

23.     Dr. Andrews' evaluation of defendant demonstrated defendant's composite reading vocabulary and comprehension level was 2.3, which means he reads on the grade level of a seven-year-old hearing child in the third month of second grade. (Def.'s Supp., Ex. 1 at

8.)[11]  With respect to visual cues, defendant "did very well" on the National Technical Institute for Deaf Lip Reading test, scoring 80% correct.  (Tr. at 169-70.)

24.     Dr. Andrews randomly selected ten sentences from the transcript of defendant's arraignment hearing and asked defendant to speech read as she recited each sentence in a slow conversational tone.  (Id. at 170; see Def. Supp., Ex. 9 at 40:53-47:40.)  Defendant was not able to lip read any of these sentences.  (Id. at 171.)[12]  Dr. Andrews asked defendant to read aloud the police report he signed at the time of his arrest.  (Def.'s Supp., Ex. 1 at 9.)  While Dr. Andrews concluded defendant could not read the report, she admitted the report was, for the most part, ineligible.  (Id.)

25.     The written Miranda warnings on average are understandable to a person who reads at a seventh grade level.  (Id. at 12.)  McFall was not able to understand the Miranda warning either in written, signed, or spoken form.  (Tr. at 188.)

26.     Dr. Andrews concluded, based upon her assessments of defendant's reading, communication, language, cognitive abilities, and the psychological reports, that "he does not have the ability to understand [legal] language even with the accommodations because the accommodations are not dealing with the big problem and that's language comprehension."  (Id. at 189-90.)  Dr. Andrews testified that it would be impossible to turn the legal dialogue of the courtroom into two, three, and four word simple sentences to accommodate defendant's cognitive challenges.  (Id. at 187.)  Dr. Andrews stated that

---

[11] Dr. Andrews partially contradicted this finding at the hearing, stating defendant tested at "the first and second grade level."  (Tr. at 168.)
[12] The court notes that immediately after the introduction of legal vocabulary, defendant's lip reading skill dropped 100%, which is in stark contrast to his overall lip-reading proficiency.

defendant "lacks even minimum social communication,"[13] concluding he does not have the language skills to be able to understand courtroom discourse in speech, lip reading, reading, or writing, and does not have the language abilities to work effectively with his attorney. (Id. at 191.) Dr. Andrews admitted, however, that someone who does not understand every legal word used in a courtroom is not necessarily linguistically incompetent. (Id. at 200.)

27.    In Dr. Andrews' four-hour interaction with defendant, it was her assessment that defendant understood he had been charged with a crime of having child pornography on his computer. (Id. at 203; see Def.'s Supp., Ex. 9 at 54:45, 1:23:25.)

28.    Dr. Andrews observed generally that in conversations between defendant and counsel, he "seldom understands a lot of the questions and items" presented to him, id. at 192, and frequently states, "Do I have to go to jail now? Am I going to jail now?" (Id.) Dr. Andrews believed defendant did not understand the purpose or content of the competency hearing. (Id.)

29.    Dr. Andrews agreed that it is better for people to sit closer to his right ear even though she conducted her entire evaluation of defendant's hearing and language comprehension while sitting on his left side. (Id. at 194-95; see Def.'s Supp., Ex. 9.)

    **E.  Psychological evaluations**

30.    At defense counsel's request, Dr. Joel D. Grover ("Dr. Grover")[14] prepared a psychoeducational evaluation report (*CONFIDENTIAL*) based upon his April 8, 2008 evaluation of defendant's intellectual, academic, and adaptive behavior functioning.

---

[13] This testimony is controverted by, *inter alia*, Dr. Andrews' video-taped session with McFall, during which she engaged in extensive social communication with defendant about a variety of topics. (See Def.'s Supp., Ex. 9.)
[14] Dr. Grover did not testify at the hearing.

(Def.'s Supp., Ex. 3 at 1.)  Dr. Grover noted that on the day of examination, "rapport was established quickly and easily with William.  William impressed this examiner as a pleasant, curious individual."  (Id.)  Dr. Grover's report concluded defendant's Full Scale IQ score was 65.  (Id. at 2.)  Although his score placed him in the low average range for individuals his age, defendant's performance on the Perceptual Reasoning Index was an area of strength.  (Id. at 7.)  Dr. Grover concluded defendant's "scores on measures of intellectual, academic, and adaptive behavior measures meets the necessary criteria for identifying him as a Deaf individual with Mild Intellectual Disability."  (Id.)

31.     At defense counsel's request, Dr. McCay Vernon ("Dr. Vernon")[15] prepared a psychological evaluation report based upon his November 10, 2009 examination of defendant to determine, *inter alia*, his linguistic competence to stand trial.  (Def.'s Mot. to Determine Competency, Ex. 3 at 1.)  In his report, Dr. Vernon concluded, based upon defendant's profound deafness, intellectual limitations, and rudimentary reading ability, he would be unable to follow or comprehend court proceedings, or to assist counsel, and could not be accommodated with either simultaneous transcription or an American Sign Language interpreter.  (Id.)  Dr. Vernon indicated that defendant had a scaled IQ score of 70 when he was tested in 1970 at the age of 16.  (Id. at 4.)

        **F.  Competency hearing observations**

32.     During the competency hearing, defendant was provided a neck loop that enabled the court's infrared system to work with his hearing aid's t-coil setting.  Various strategically positioned cameras were utilized in the courtroom.  Generally, the speaker on the screen was the witness.  The images of the speakers were displayed on a screen placed in front

---

[15] Dr. Vernon did not testify at the hearing.

of defendant.  While questioning a witness, a counsel stood next to defendant and faced

him so he could view his or her lips.  The proceedings took place in front of defendant

and on his left side.  Accounting for breaks, the hearing lasted approximately five and

one half hours, during which defendant indicated he had difficulty hearing or

understanding the proceedings on three occasions.  (Tr. at 11, 25-26, 27.)  Defendant

indicated that, at one point, the amount of volume coming through the hearing aid gave

him a headache.  (Id. at 47.)  A brief recess was taken and counsel provided defendant

with two Excedrin Extra Strength aspirin which alleviated his headache.  (Id. at 51.)


### III. Conclusions of law

1.  "It is well established that the Due Process Clause of the Fourteenth Amendment

prohibits the criminal prosecution of a defendant who is not competent to stand trial."

Medina v. California, 505 U.S. 437, 440 (1992).  This prohibition is "fundamental to an

adversary system of justice."  Drope v. Missouri, 420 U.S. 162, 172 (1975).  When a

district court must determine whether a defendant is competent to stand trial, "the test

must be whether he has sufficient present ability to consult with his lawyer with a

reasonable degree of rational understanding – and whether he has a rational as well as

factual understanding of the proceedings against him."  Dusky v. United States, 362 U.S.

388, 402 (1960).  In other words, a defendant "whose mental condition is such that he

lacks the capacity to understand the nature and object of the proceedings against him, to

consult with counsel, and to assist in preparing his defense may not be subjected to a

trial."  Drope, 420 U.S. at 171.

2. Section 4241 provides that any time after the commencement of a prosecution, either the government or defense counsel may move for a hearing to determine the defendant's mental competency. 18 U.S.C. § 4241(a).

> The court shall grant the motion, or shall order a hearing on its own motion, if there is reasonable cause to believe that the defendant . . . is [(a)] unable to understand the nature and consequences of the proceedings against him or [(b)] to assist properly in his defense.

Id. (alterations added). At the conclusion of the evidentiary hearing, the court shall make a finding *by a preponderance of the evidence* as to the accused's mental competency to stand trial. Id. at (d) (emphasis added).

3. "At the competency hearing, the Government has the burden to prove the defendant's competency" by a preponderance of the evidence. United States v. Velasquez, 885 F.2d 1076, 1089 (3d Cir. 1989). "[N]o burden of proof rests on a defendant to demonstrate his own incompetency." United States v. Hollis, 569 F.2d 199, 205 (3d Cir. 1977).[16] In determining whether a finding of incompetency is warranted, a court should consider a number of factors, including "evidence of a defendant's irrational behavior, [the defendant's] demeanor at [the competency hearing], and any prior medical opinion on competence to stand trial." Drope, 420 U.S. at 180 (the question of competency "is often a difficult one in which a wide range of manifestations and subtle nuances are implicated" and its difficulty "is suggested by the varying opinions trained [experts] can entertain on the same facts"). Courts may consider whether a physical disability renders

---

[16] At the competency hearing, the parties stipulated to the government's burden to demonstrate the defendant's competence by a preponderance of the evidence. (Tr. at 3-4.)

a defendant mentally incompetent under § 4241 and <u>Dusky</u>.  <u>See</u> <u>United States v. Jones</u>, 495 F.3d 274, 277 (6th Cir. 2007).

4.      *Competent* defendants "often do not fully comprehend the intricacies of some of the defensive theories offered by their lawyers.  That level of comprehension is not a requirement of competency."  <u>United States v. Hogan</u>, 986 F.2d 1364, 1373 (11th Cir. 1993).  Furthermore, a defendant with a low IQ who does not understand the meaning of legal terminology, such as the "right to remain silent," "waiver," "receiving stolen goods," or "attorney" is not *per se* mentally incompetent to stand trial.  <u>United States v. Glover</u>, 596 F.2d 857, 865 (9th Cir. 1979).  "[M]ental retardation alone does not necessarily render one legally incompetent to stand trial."  <u>Stanley v. Lazaroff</u>, 82 F. App'x 407, 419 (6th Cir. 2003).

5.      In <u>Stanley</u>, a deaf and mildly retarded defendant was convicted of murder in an Ohio state court.  <u>Stanley</u>, 82 F. App'x at 408.  A petition for a writ of habeas corpus was filed and the district court granted a certificate of appealability with respect to the defendant's challenge of the state court's ruling that he was competent to stand trial.  <u>Id.</u> at 410.

6.      During the state court's competency hearing, the defendant offered the testimony of Dr. Vernon regarding defendant's competency to stand trial. [17]  Dr. Vernon stated defendant had "a limited ability to sign" and that his ability to finger spell was limited because of his low reading level.  <u>Id.</u> at 412.  Dr. Vernon stated the defendant was not competent to deal with technical vernacular or other conceptual materials.  <u>Id.</u>  The defendant read at a

---

[17] In <u>Stanley</u>, Dr. Vernon was the same individual who conducted a psychological evaluation of defendant in the case *sub judice*.

1.1 grade level and was mildly mentally retarded based in part on his IQ score.  Id. at 412-13.

7.     Dr. Vernon concluded that the defendant (1) "was unable to understand the specific concepts regarding the trial setting and the different actors involved, or to assist his attorney;" (2) "was not able to discuss anything of significance" with his attorney; and (3) "was incapable of communicating information back to [Dr.] Vernon in a comprehensible manner."  Id. at 413.

8.     Dr. Vernon stated, however, that the defendant knew "he had been accused of killing an elderly woman and that killing was wrong."  Id.

9.     Despite conflicting expert testimony about the defendant's comprehension of court proceedings, the court of appeals in Stanley held that expert testimony supported a finding that the defendant "knew he was accused of killing a woman, understood that he could be punished, was able to engage in some meaningful communication with his attorney and with various experts, was able to relate past events, and was able to understand testimony . . . ."  Id. at 416.  Based upon those findings, the court of appeals held it was proper for the state court to find the defendant competent to stand trial.  Id. at 417.[18]

10.    In Shook v. Mississippi, No. 00-60436, 2001 WL 1692449 (5th Cir. Nov. 26, 2001) (unpublished), the court of appeals considered the competency of a defendant who was a

---

[18] Defendant distinguishes Stanley from this case because in Stanley, the defendant knew sign language and had the benefit of two interpreters during the state court competency hearing.  (Def.'s Proposed Findings of Fact and Conclusions of Law (ECF No. 75), ¶ 156.)  The defendant in Stanley had a limited ability to sign and his communications with Dr. Vernon were incomprehensible.  Moreover, while interpreters were provided to the defendant, he did not have any ability to hear the proceedings, unlike the defendant in this case.

profoundly deaf person and did not know sign language.  <u>Shook</u>, 2001 WL 1692449 at

*1.  The court in <u>Shook</u> was faced with a challenge to a denial of habeas relief.  <u>Id.</u>[19]

11.     At his competency hearing, a defense expert testified that the defendant "could not hear

        speech," and that he "frequently answered questions inappropriately, which indicated he

        did not speech-read successfully."  <u>Id.</u> at *2.

12.     A speech pathologist testified that the defendant was unable to understand phrases longer

        than two or three words, it was difficult for him to grasp abstract concepts, and it would

        be difficult for the defendant to follow conversation among various individuals in a

        courtroom.  <u>Id.</u>

13.     The defendant's father testified that his son "would not understand that he had a right to

        an attorney and had difficulty understanding discussions with defense counsel."  <u>Id.</u> at 3.

        An audiologist testified that the defendant had a profound hearing loss and she doubted

        the defendant could hear normal conversation with a hearing aid.  <u>Id.</u> at 5.  Evidence at

        the hearing indicated the defendant scored 40% on a word test when he used hearing aids

        and speech reading.  <u>Id.</u> at 4.

14.     Another audiologist testified the defendant "lacked the language to understand abstract

        concepts such as constitutional rights, alibis, plea bargaining, and pleading guilty or not

        guilty, and would have difficulty communicating with his attorney."  <u>Id.</u> at 5.  The

        audiologist concluded, however, that the defendant "knew he was in trouble, understood

---

[19] In <u>Shook</u>, the defendant had the benefit of a Mississippi state court competency hearing, and that court's finding of competency was affirmed by the Mississippi Supreme Court.  <u>Shook</u>, 2001 WL 1692449, at *1.  During habeas proceedings before the district court, two additional competency hearings were held; one before the magistrate judge and the other before the district judge.  <u>Id.</u>  Because the testimony and findings at all three hearings were substantially similar, the court will refer to the state court testimony and findings unless otherwise indicated.

he might go to jail, and understood that some of the people in the courtroom wanted to put him in jail, while others wanted to keep him out of jail." Id.

15. Dr. Vernon, a psychologist specializing in deafness,[20] stated the defendant could not "hear speech well enough to understand it, with or without hearing aids," that he "would probably understand, at best, five percent of what was going on" in the courtroom, and he "could not assist counsel in the preparation of his defense." Id. at 6. Dr. Vernon also found the defendant's IQ was 106 or 108, slightly higher than average. Id.

16. At the conclusion of the hearing, the state trial court ordered the defendant to submit to a psychological evaluation at the Mississippi State Hospital "to determine both his competency to stand trial and his criminal responsibility . . . ." Id. at 7.

17. The hospital staff submitted a report to the court and unanimously concluded the defendant "understood his legal situation; could cooperate with his attorney; and was competent to stand trial." Id. The report also found evidence the defendant was malingering regarding his "inability to read, write, or understand anything said." Id.

18. After the submission of the hospital report, the state trial court found the defendant competent to stand trial. Id. At a conference before trial, the state trial court discussed the defendant's inability to understand court proceedings or legal terms, stating the following:

> Certainly, from the standpoint of understanding legal terminology, it's been the experience of this Court that well-educated people who have no hearing impairment or any problems at all come into court without an understanding of the proceedings or how court is conducted and have problems. So I don't think it's anything unusual about having problems with legal terminology.

---

[20] This is the same psychologist who was called by the defense in the case at bar.

Id. at 8.

19.    On review, the magistrate judge recommended granting habeas relief because the state trial court "erred in its competency ruling by relying on the testimony of lay persons and Mississippi State Hospital physicians who had no expertise in working with deaf persons." Id. at 12. On review by the district judge, another evidentiary hearing was conducted, and the district court concluded the state trial court was correct in finding the defendant competent. Id. at 14. The district court's holding was based in part on the state trial court's appointment of an oral interpreter to assist the defendant at trial. Id. The interpreter communicated with the defendant "using a combination of writing and allowing him to speech-read, along with visual cues, gestures, and diagrams." Id. at 13. The interpreter "attempted to reword and restructure language to make it more comprehensible" to the defendant and "she tried to write for him on a third-grade level" to accommodate his low comprehension level. Id.

20.    The court of appeals affirmed the conclusions of the state court and district court that the defendant was competent to stand trial. The court of appeals in Shook commented that the state trial court properly relied on the hospital report despite those physicians not having experience with deaf individuals, and the district court properly weighed conflicting testimony from various experts and found the totality of the testimony demonstrated the defendant was competent. Id. at 16.[21]

---

[21] Defendant argues Shook is inapposite here because, *inter alia*, the defendant was trained to speech read, had the language ability of an eleven or twelve-year-old, and was a college student. (See Def.'s Proposed Findings of Fact and Conclusions of Law, ¶¶ 149-51.) Defendant's arguments are not persuasive for several reasons. First, the defendant in Shook attempted training at speech reading, but stopped attending sessions. Shook, 2001 WL 1692449, at *2. Experts testified that the defendant could not successfully speech read. Second, while the defendant's *overall* linguistic functional equivalent was that of a ten and one-half-year-old child, his age equivalent score on vocabulary

21.    Defendant in this case relies upon <u>United States v. Jones</u>, No. 03-226, 2008 WL 5204063 (E.D. Tenn. Dec. 11, 2008), for the proposition that he should be found mentally incompetent to stand trial because of his cognitive and communicative deficits. In <u>Jones</u>, the "defendant suffered from bilateral hearing loss, as well as average to low-average intellectual functioning." <u>Jones</u>, 2008 WL 5204063, at *1.

22.    The trial court noted during the competency hearing that the defendant had "extensive difficulty" understanding the proceedings, "frequently interrupting the Court to say he could not understand, even when the Court was engaged in the relatively routine exercise of stating the case's procedural history . . . ." <u>Id.</u> at 3.

23.    The defendant in <u>Jones</u> did not understand sign language and had difficulty reading or understanding a real-time transcription of the competency hearing. <u>Id.</u> at **3-4 n.3, 6.

24.    An American Sign Language interpreter assigned to the defendant for the hearing testified that the defendant "understood only twenty to thirty percent of the hearing, and that [the defendant] would not be able to understand parties who were speaking in a courtroom setting." <u>Id.</u> at 6. In the interpreter's opinion, the defendant "could not participate in and understand the proceedings in a trial in his case." <u>Id.</u>

25.    The district court in <u>Jones</u> held the defendant physically incompetent to stand trial; finding that various accommodations would "inordinately delay the trial," and would not ensure the defendant "actually understands the dispositive legal concepts being presented." <u>Id.</u>

---

was that of a six and one-half-year-old child. <u>Id.</u> At the trial, the interpreter broke phrases down to a third-grade reading level to accommodate the defendant's linguistic impairments. Finally, while the defendant was an enrolled college student, his father and sister repeatedly testified that they helped the defendant complete his assignments and that, even though he demonstrated an ability to read, he "did not understand what he read." <u>Id.</u> at 3.

26.     The court finds McFall's reliance upon the holding in <u>Jones</u> unpersuasive.  In <u>Jones</u>, the

defendant repeatedly interrupted the competency hearing to announce he could not hear

or understand what was being said.  Here, McFall only interrupted the five-hour

competency hearing on three occasions.  The defendant in <u>Jones</u> could not understand

sign language and had difficulty reading, but the court relied primarily on the sign

language interpreter and the live transcript to determine no accommodations were

adequate to provide defendant a fair trial.  Tellingly, the court did not use or did not have

access to technology that could increase the defendant's ability to hear the proceedings

and lip read the speaker's mouth.  While accommodating the defendant's twin disabilities

in <u>Jones</u> may have delayed the trial, that reason alone is not sufficient to find a defendant

incompetent to stand trial.  <u>See</u> <u>Glover</u>, 596 F.2d at 867 ("The fact that a defendant might

not understand the proceedings unless they are explained to him in simple language

would put additional burdens on counsel, but certainly does not establish that the

defendant is incompetent to stand trial.").

27.     Here, defendant has the benefit of a courtroom outfitted with appropriate technology to

accommodate his hearing loss and his cognitive impairments.  All speech in the

courtroom will be fed directly into his hearing aid with negligible background noise.

Additionally, defendant can switch his hearing aid off its t-coil setting at any time during

the proceedings to communicate with his counsel or his counsel may request a recess to

communicate with him.  Defendant will be able to view each speaker's lips on screens

placed on counsel's table, and counsel will stand next to defendant and face him so he is

able to clearly see their lips.  The court also can provide simultaneous transcriptions of

the proceedings to defendant if he wishes to review with his attorney statements made at

any time during trial. Defendant may be permitted to position himself on the left-hand-side of the courtroom so that the proceedings are presented as close to his right ear as possible. These accommodations, as recommended by Ms. Hodges and Ms. Mosallem, should allow defendant to hear in the 76-100% range due to his reliance on speech reading.

28.    The trial must be conducted at a pace that permits defendant to process speech so that he understands in a rational and factual manner the testimony and his defense. All parties, including the court, must be vigilant of defendant's limitations at all times, permitting him to take numerous breaks, as necessary, to consult with counsel or to relieve the strain of listening through the t-coil and lip reading. In light of Shook, the court will require an oral interpreter for defendant be present at trial so that defendant may have the benefit of a skilled technician who can take courtroom dialogue language and break it down for defendant into simple and concrete concepts. The competency hearing testimony reflects defendant will achieve a greater level of comprehension if speech moves slowly and in simple terms; an interpreter could help achieve that end. The court concludes that the auditory and cognitive accommodations listed supra will permit defendant to consult with his lawyer with a reasonable degree of rational understanding and will allow him to have a rational as well as factual understanding of the proceedings at trial.

29.    Defendant has a bilateral hearing loss and is borderline mentally retarded; the parties do not dispute this finding. Where the parties diverge is whether defendant is competent to consult with his attorney and have a rational and factual understanding of the proceedings. The caselaw recognizes that severely hearing and cognitively impaired people may be competent to stand trial when the appropriate accommodations are made.

30.      Defendant's proficiencies in daily life show that he is responsible for all his finances, buys groceries, supported a son for eighteen years, cares for his aunt, maintains his car and can independently drive for at least an hour. Notably, defendant is capable of using his computer and the internet to buy numerous items from EBay, an online auctioning website.

31.      The court recognizes defendant's hearing and cognitive abilities are significantly impaired; the testimony of all the experts reflects that to some extent. The court agrees with Dr. Andrews that those disabilities make it difficult for defendant to understand legal terminology used in court. Defendant's inability to define words like "right," or "arraignment," however, does not render him incompetent under <u>Dusky</u>. The test is not whether a defendant can understand the legal terms and vernacular of attorneys and judges, but whether he has a "rational and factual understanding" of the trial and can consult with his attorneys. <u>See</u> <u>Shook</u> discussed <u>supra</u>. Defendant knows the charge against him, believes someone should be punished for providing child pornography on the internet, acknowledges he made a mistake engaging in the conduct relevant to the charge, admits he has "learned his lesson," and understands he may go to jail. The court finds that under <u>Shook</u> and <u>Stanley</u>, the government met its burden and proved by a preponderance of the evidence that defendant has a factual and rational understanding of the proceedings and can consult with his attorney with a reasonable degree of rational understanding.

## *IV. Conclusion*

For the above reasons, defendant is competent to stand trial.  An appropriate order will be issued.

By the court:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: February 4, 2011